Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
06/16/2023 09:05 AM CDT

Brush & Co., a Nebraska corporation,
appellant, v. W. O. Zangger & Son, Inc.,
a Nebraska corporation, appellee.

___ N.W.2d ___

Filed June 16, 2023.    No. S-22-488.

1. **Contracts.** The interpretation of a contract and whether the contract is ambiguous are questions of law subject to independent review.

2. **Summary Judgment: Appeal and Error.** An appellate court affirms a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law.

3. **Contracts.** In interpreting a contract, a court must first determine, as a matter of law, whether the contract is ambiguous.

4. ____. A contract must receive a reasonable construction and must be construed as a whole.

5. ____. If possible, effect must be given to every part of a contract.

6. **Contracts: Intent.** A contract which is written in clear and unambiguous language is not subject to interpretation or construction; rather, the intent of the parties must be determined from the contents of the contract, and the contract must be enforced according to its terms.

7. **Contracts: Evidence.** A contract found to be ambiguous presents a question of fact and permits the consideration of extrinsic evidence to determine the meaning of the contract.

8. **Contracts: Words and Phrases.** A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings.

9. **Contracts.** When a contract is ambiguous, the court may consider all facts and circumstances leading up to the contract's execution, the nature and situation of the subject matter, and the apparent purpose of the contract.

10. **Contracts: Intent.** In the absence of anything to indicate a contrary intention, instruments executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction are legally one instrument and will be construed together as if they were as much one in form as they are in substance.

11. **Contracts.** Parties to a contract may incorporate contractual terms by reference to a separate, noncontemporaneous document.

12. **Contracts: Summary Judgment.** The interpretation of an ambiguous contract presents an issue of fact not appropriate for determination on summary judgment.

13. **Appeal and Error.** An appellate court is not obligated to engage in an analysis that is not needed to adjudicate the controversy before it.

14. ____. An appellate court may, at its discretion, discuss issues unnecessary to the disposition of an appeal where those issues are likely to recur during further proceedings.

Appeal from the District Court for Valley County: KARIN L. NOAKES, Judge. Reversed and remanded for further proceedings.

Edward D. Hotz, of Pansing, Hogan, Ernst & Bachman, L.L.P., for appellant.

Elizabeth L. Enroth and Donald L. Swanson, of Koley Jessen, P.C., L.L.O., for appellee.

HEAVICAN, C.J., CASSEL, STACY, FUNKE, PAPIK, and FREUDENBERG, JJ.

CASSEL, J.

## I. INTRODUCTION

After parties to a long-term written lease purportedly failed to agree when renegotiating minimum rent, the owner sued the tenant for breach of contract. The district court granted a partial summary judgment construing the lease and, after a trial, entered a judgment, from which the owner appeals. Construing the lease together with a contemporaneous instrument that referenced an earlier document, we find ambiguity concerning the lowest amount of minimum rent possible. This ambiguity created a factual issue, which precluded

summary judgment. We reverse the judgment and remand the cause for further proceedings.

## II. BACKGROUND

### 1. Relationship Between Parties

A brief historical background concerning the parties and their relationship is helpful. Brush & Co. (Brush) is a family company, and its president is William Brush (William). W. O. Zangger & Son, Inc. (WOZ), is a corporation that has had various members of the Zangger family act as president.

WOZ is engaged in agricultural operations, including hybrid popcorn seed production and row crop agriculture. Land referred to as "South Place," located near WOZ's operation, was integral to WOZ's business. Charles P. Zangger acquired the land in 1977, and his family farmed it since that time.

In the early 1980s, Brush became involved in the "popcorn business" after William met with Zangger. William recognized that WOZ and Zangger were in financial distress due to a farm crisis. In 1984, WOZ, its shareholders, and Brush entered into an "Agreement for Reorganization of [WOZ]." The agreement gave Brush the option to purchase all of WOZ's stock for $1 per share. Brush later exercised the option and became the 100-percent owner of WOZ.

In 2005, Brush sold 50 percent of WOZ's stock to Zangger. On the same day, the parties executed a "Shareholders Agreement," which set forth terms for a partial redemption of Brush's stock. The Shareholders Agreement was referenced in a subsequent agreement and will be discussed further in the analysis. Also on that day, William and Zangger entered into an "Operating and Management Agreement," which touched on rental of South Place by WOZ and referred to the Shareholders Agreement.

### 2. 2008 Agreement and Farm Lease

On the same day in 2008, Brush and WOZ signed an "Agreement" and a "Farm Lease." These documents are at the heart of this appeal. Key provisions of each document follow.

The 2008 Agreement incorporated several recitals concerning the 2005 Shareholders Agreement. It stated that the parties wished to carry out the terms of paragraph 15 of the 2005 Shareholders Agreement. The 2008 Agreement stated that WOZ would execute a deed transferring South Place to Brush and that Brush would contemporaneously execute its stock certificate in WOZ. The 2008 Agreement further stated that "[t]he parties shall enter into a lease wherein Brush . . . leases to [WOZ] the South Place on the terms and conditions set forth in said lease."

The 2008 Farm Lease contained a number of recitals that were incorporated into the lease. One declared that Brush was withdrawing from WOZ and was receiving South Place as part of the compensation for Brush's interest in WOZ. Another stated that "for purposes of the valuation and division of property as a part of [Brush's] withdrawal from [WOZ], the division and valuation of such interest [are] dependent upon the establishment of a long term lease as provided herein which provides mutual benefits and advantages to each party." Other recitals set forth mutual advantages of the lease: "the long term availability of [South Place] to [WOZ] for the continued agricultural operations, hybrid seed production, and the strategic location of the property" and "the long term availability of an established landlord/tenant arrangement and the financial security and income interest of [Brush] in continuing such a relationship based upon the rental arrangements established as a part of this Farm Lease." The final recital stated that the parties intended for WOZ to have the opportunity to continue leasing the property on a long-term basis with a right of first refusal.

The Farm Lease identified Brush as owner and WOZ as tenant. It established a term of 24 years, from March 2009 to the end of February 2034. The lease contained two sections addressing rental payments, which we will set out in full in the analysis. We summarize them here.

Section 4 of the Farm Lease referred to two categories of rent. One was minimum rent, which rent was due annually by March 1. For the first 3 years, the lease set minimum rent at $35,000. The other category was possible additional rent, which was due annually by July 15. The additional rent was calculated by taking 25 percent of the pretax and prebonus net profits of WOZ. The lease provided that "[i]n calculating the total rent, the $35,000.00 prepayment . . . will be used as a credit against the said 25% of net profits as defined above."

Section 5 of the Farm Lease addressed renegotiation of minimum rent, which was to occur every 3 years. The lease provided that if the parties were unable to agree on an amount by February 1 of the renegotiation year, the lease would continue for 1 year "at the previously agreed minimum rental amount, however, the minimum rental rate shall not be lower than $35,000.00." The rental arrangement would then terminate at the end of that 1-year period. The parties renegotiated the minimum rent in 2013 and 2016.

### 3. ADDENDUM TO FARM LEASE

In 2016, Brush negotiated a mortgage loan secured by South Place and the parties executed an "Addendum to Farm Lease." Although the addendum modified rental payments and included a "cap" on rent, the addendum ceased to be in force in 2018 and neither party contends that the cap has any application to the appeal before us.

### 4. 2019 NEGOTIATIONS OF
### MINIMUM RENT

In accordance with the Farm Lease, the parties attempted to renegotiate the minimum rent. After preliminary proposals were exchanged, final negotiations occurred on January 31, 2019. On that day, WOZ proposed increasing minimum rent to $80,000 if rent were capped at $120,000. Brush asked if WOZ would consider a minimum of $70,000 with a cap of $140,000. WOZ remained with its previous offer.

The parties' communications on January 31, 2019, reflected their respective understandings of the lease's terms. Brush stated: "The Farm Lease provides in Renegotiation of Minimum Rent, that 'the minimum rental rate shall not be lower th[an] $35,000'. We will continue for the next three years with a Minimum Rent of $35,000. There will be no cap on the share of profits." WOZ replied: "[W]e do not agree with your interpretation[.] It looks like it will default at midnight. We will then send you a check for [$45,000] and continue as the lease says for one more year, cropping year 2019." Brush retorted: "Better read the lease. It is not in default. 'The minimum rental rate shall not be lower than $35,000.00', which is what it is set at for the next three years."

## 5. Pleadings

Brush sued WOZ. It set forth separate "cause[s] of action" for express breach of contract, declaratory judgment, and breach of the implied duty of good faith and fair dealing.

The breach of contract cause of action was premised upon WOZ's failure to pay rent. Brush alleged that WOZ did not pay any rent due in 2019. According to Brush, even if the Farm Lease terminated on February 29, 2020, WOZ still owed rent for that crop year of 25 percent of WOZ's pretax, prebonus profits for the fiscal year immediately preceding April 30, 2020.

Brush requested a declaration that the Farm Lease did not terminate in February 2020 and an order that the lease be specifically enforced until February 2034. In the alternative to specific performance, Brush requested damages calculated based upon future rent anticipated until 2034.

Finally, Brush alleged that WOZ breached the implied duty of good faith and fair dealing. Brush asserted that WOZ unreasonably refused to negotiate minimum rent without a cap on rent.

Insofar as it is pertinent to the present appeal, WOZ's operative answer denied the allegations of Brush's complaint.

### 6. Summary Judgment

Each party moved for summary judgment. The court considered the motions separately. The court denied Brush's motion as to breach. It found that there were material facts in dispute, including whether WOZ renegotiated the lease agreement in good faith.

Three months later, the court entered partial summary judgment in WOZ's favor. The court rejected Brush's argument that the Farm Lease required a minimum rent of $35,000. The court reasoned that the provision in the lease's section 5 stating that if the parties did not agree, the lease would continue at the previously agreed-upon minimum rent, which "shall not be lower than $35,000," contemplated that the minimum rent could be less than $35,000. The court explained, "The plain reading of the contract shows that after the first three years of the original agreement, the minimum rent of $35,000 only applies to the year following the failure to agree on minimum rent."

The court found that the terms regarding rental of South Place were unenforceable beyond the terms of the 2016 agreement. It reached that conclusion on the basis that rent was an essential term of the Farm Lease and that no minimum rent was established for the period between March 2020 and February 2034.

The court determined that when the parties did not agree on minimum rent by February 1, 2019, the termination clause went into effect. Under that clause, it reasoned, WOZ had to continue farming until February 29, 2020, at the minimum rental rate agreed to in 2016 and to pay any additional rent specified in section 4 of the Farm Lease by July 15, 2019.

The court found that there were material facts in dispute as to whether WOZ violated the implied duty of good faith and fair dealing when renegotiating the minimum rent.

### 7. Trial

The court conducted a bench trial on whether WOZ breached a promise to renegotiate in good faith and on any damages

that may have resulted. William explained that the rationale behind the renegotiation of minimum rent every 3 years was to cover basic expenses like real estate taxes. The possible additional rent, William testified, was "in lieu of any compensation to Brush . . . for the value of the popcorn hybrid seed business" that Brush's staff helped WOZ develop. Because the Farm Lease stated that minimum rent shall never be less than $35,000, William believed his agreement to that amount settled the matter.

When renegotiating minimum rent in 2019, WOZ wished to continue farming South Place but sought a cap to make rental payments more predictable. An exhibit reflecting calculations and payments of rent showed that from 2009 to 2019, WOZ's rent payments to Brush ranged from a low of $42,700 in 2010 to a high of $324,923 in 2014. The average rent paid during that period amounted to $118,530.

## 8. Judgment

The court entered its judgment on the matters heard at trial. The court considered several factors to determine whether WOZ negotiated in good faith. Ultimately, the court found that Brush failed to meet its burden to show that WOZ acted in bad faith and that it failed to present any evidence supporting damages. Accordingly, the court entered judgment for WOZ and against Brush.

Brush filed a timely appeal, which we moved to our docket.[1]

## III. ASSIGNMENTS OF ERROR

Brush alleges, restated and reordered, that the district court erred (1) in failing to interpret the Farm Lease to provide that the minimum rent could never be lower than $35,000, (2) in failing to find that WOZ violated its duty of good faith and fair dealing by insisting on a cap on rent, (3) in prohibiting evidence of expectant contract damages and limiting

---

[1] See Neb. Rev. Stat. § 24-1106(3) (Cum. Supp. 2022).

damages to those incurred during the unsuccessful renegotiation of minimum rent, and (4) in failing to award damages for the March 2019 to February 2020 crop year.

## IV. STANDARD OF REVIEW

[1] The interpretation of a contract and whether the contract is ambiguous are questions of law subject to independent review.[2]

[2] An appellate court affirms a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law.[3]

## V. ANALYSIS

### 1. Minimum Rent

Analyzing Brush's assignment of error concerning rent requires us to determine the correct interpretation of the lease. Brush believed that $35,000 was a "floor" on rent and that its offer of $35,000 meant that the lease continued for the next 3 years with that amount as minimum rent. According to Brush, it did not need WOZ's agreement to $35,000, because that amount was the lowest rent possible under the Farm Lease. But WOZ contended that there was no floor on the parties' 2019 minimum rent negotiations, and thus, Brush could not unilaterally accept $35,000 as minimum rent.

### (a) Principles of Law

[3-6] We start by recalling familiar principles regarding interpretation of a contract. In interpreting a contract, a court must first determine, as a matter of law, whether the

---

[2] *Brauer v. Hartmann*, 313 Neb. 957, 987 N.W.2d 604 (2023).

[3] *Community First Bank v. First Central Bank McCook*, 310 Neb. 839, 969 N.W.2d 661 (2022).

contract is ambiguous.[4] A contract must receive a reasonable construction and must be construed as a whole.[5] If possible, effect must be given to every part of a contract.[6] A contract which is written in clear and unambiguous language is not subject to interpretation or construction; rather, the intent of the parties must be determined from the contents of the contract, and the contract must be enforced according to its terms.[7]

[7-9] A contract found to be ambiguous presents a question of fact and permits the consideration of extrinsic evidence to determine the meaning of the contract.[8] A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings.[9] When a contract is ambiguous, the court may consider all facts and circumstances leading up to the contract's execution, the nature and situation of the subject matter, and the apparent purpose of the contract.[10]

### (b) Documents To Be Construed

[10] We next determine which documents to consider with respect to the minimum rent issue. The district court appears to have focused exclusively on the terms of the Farm Lease. But the parties signed the Farm Lease on the same day that they signed the Agreement and as part of the same transaction. In the absence of anything to indicate a contrary intention, instruments executed at the same time, by the same parties,

---

[4] *Acklie v. Greater Omaha Packing Co.*, 306 Neb. 108, 944 N.W.2d 297 (2020).

[5] *Community First Bank v. First Central Bank McCook, supra* note 3.

[6] *Id.*

[7] *Keller v. Bones*, 260 Neb. 202, 615 N.W.2d 883 (2000).

[8] *Community First Bank v. First Central Bank McCook, supra* note 3.

[9] *Acklie v. Greater Omaha Packing Co., supra* note 4.

[10] *Nebraska Depository Inst. Guar. Corp. v. Stastny*, 243 Neb. 36, 497 N.W.2d 657 (1993).

for the same purpose, and in the course of the same transaction are legally one instrument and will be construed together as if they were as much one in form as they are in substance.[11] Thus, we will read and construe the 2008 Agreement and Farm Lease as one instrument.

[11] Those contemporaneous documents are not the only documents to be considered. During oral argument, WOZ's counsel "agree[d] with looking outside the 2008 Agreement as well because . . . the 2008 [Agreement] therein references the 2005 agreement." Indeed, parties to a contract may incorporate contractual terms by reference to a separate, noncontemporaneous document.[12] Here, the 2008 Agreement specifically referenced and incorporated paragraph 15 of the 2005 Shareholders Agreement. Thus, we also consider the 2005 Shareholders Agreement.

In connection with the 2005 Shareholders Agreement, William and Zangger contemporaneously entered into the Operating and Management Agreement concerning WOZ. That operating agreement referenced the 2005 Shareholders Agreement, stating, "contemporaneously herewith, the parties hereto have entered into a shareholders agreement." Because these documents were executed in the course of the same transaction, we construe the 2005 agreements together.

### (c) Terms of Documents

We now set forth the pertinent terms contained in the 2008 Farm Lease and Agreement and the 2005 Shareholders Agreement. The Farm Lease set forth the following rent provisions:

> 4. <u>Rental</u>. The Tenant agrees to use the farm for hybrid seed production and row-crop agricultural purposes, and to pay the Owner or its assigns, rent in the minimum

---

[11] See *Nowak v. Burke Energy Corp.*, 227 Neb. 463, 418 N.W.2d 236 (1988).

[12] 11 Richard A. Lord, A Treatise on the Law of Contracts by Samuel Williston § 30:25 (4th ed. 2012).

amount of $35,000.00 each year with said $35,000.00 being paid on May 1, 2009, March 1, 2010 and March 1, 2011. As possible additional rent, by July 15 of each year, a profit sharing distribution shall be made calculated by taking 25% of the pre-tax and pre-bonus net profits of [WOZ] for the preceding fiscal year which ends the immediately preceding April 30. In calculating the total rent, the $35,000.00 prepayment shall not be deducted as an operating expense, but will be used as a credit against the said 25% of net profits as defined above. As an example, in the event the net profits are $140,000.00 or less, the $35,000.00 prepaid rental payment will constitute the full rental in that particular year.

[Address for submission of payments and messages.]

5. Renegotiation of Minimum Rent. During the term of this Lease, the minimum rental amount shall be renegotiated by the Owner and the Tenant every three (3) years. The first such renegotiation shall be concluded no later than February 1, 2013, and shall apply to the leased term for March 1, 2013 to the last day of February, 2016. The minimum rental rate shall be renegotiated every three (3) years thereafter during the term of this Farm Lease in a like manner. In the event the parties are unable to agree upon the renegotiated minimum rental amount by the first day of February of the renegotiation year, the lease shall be continued for an additional period of one (1) year at the previously agreed minimum rental amount, however, the minimum rental rate shall not be lower than $35,000.00. At the conclusion of such additional one (1) year, the rental arrangement shall terminate, however, the Tenant's right of first refusal shall continue in full force and effect.

The 2008 Agreement recited that the 2005 Shareholders Agreement established a procedure in paragraph 15 for redeeming Brush's stock. The 2008 Agreement stated that "the parties hereto now wish to carry out the terms of

paragraph 15 of said shareholders agreement" and that "paragraph 15.1(b) provides that Brush shall offer the 'South Place' for rent to [WOZ] for a certain price or formula, which recognizes intangible value existing in [WOZ]."

Paragraph 15 of the 2005 Shareholders Agreement stated that if "'South Place' is distributed to Brush . . . , same shall be offered for rent to [WOZ] for the greater of $35,000.00 or 25% of the corporate pretax, pre-bonus net profits, each year." The Operating and Management Agreement similarly provided that if there was a partial redemption of Brush's stock for South Place, "WOZ shall have the first right to rent said 'South Place' each year for 25% of pre-tax, pre-bonus profits or $35,000.00, whichever is greater."

(d) Application of Principles of Law

We apply the principles of law set out above to determine whether the lease and incorporated documents are clear regarding minimum rent or whether there is ambiguity. This depends upon whether there are two reasonable, conflicting ways of interpreting the agreement.

One reading is that minimum rent owed by WOZ to Brush could never be lower than $35,000. The $35,000 amount is identified as a minimum amount in sections 4 and 5 of the Farm Lease, in paragraph 15 of the 2005 Shareholders Agreement, and also in the 2005 Operating and Management Agreement. The parties could have contemplated that such an amount was necessary to cover basic expenses incurred every year.

A different interpretation is also logical. The lease unequivocally set $35,000 as the minimum rent for the first 3 years. But it also required the parties to then renegotiate the minimum rent every 3 years. The parties could have easily provided in the lease that rent shall never be less than $35,000. At one point, they do. But the Farm Lease's provision that "the minimum rental rate shall not be lower than $35,000.00" appears only in a clause addressing the consequences when

the parties fail to agree upon renegotiated rent and the lease continues for 1 year. The parties undoubtedly contemplated that circumstances could change over the course of the 24-year lease, and it would be reasonable to read the lease as not setting an absolute minimum amount of rent.

[12] We conclude that the provision regarding minimum rent is ambiguous, because the lease is susceptible of at least two reasonable interpretations. The interpretation of an ambiguous contract presents an issue of fact not appropriate for determination on summary judgment.[13] Accordingly, the court's entry of partial summary judgment on the issue must be reversed and the cause must be remanded for further proceedings.

Our disposition is a general remand.[14] The parties stand in the same position as if the case had never been tried,[15] and they are returned to where they stood before the court entered its partial summary judgment.

## 2. Other Assigned Errors

[13] Our determination that the partial summary judgment must be reversed and the cause must be remanded for further proceedings disposes of this appeal. The proceedings that followed the partial summary judgment, including the formulation of the issues at trial, were premised upon the court's interpretation of the lease. Because the court should not have settled the meaning of the contract regarding minimum rent as a matter of law, the proceedings that followed were based on a flawed premise. Brush assigns error to some of the court's determinations that followed from the flawed premise, but an appellate court is not obligated to engage in an analysis that is not needed to adjudicate the controversy before it.[16]

---

[13] *Bierman v. Benjamin*, 305 Neb. 860, 943 N.W.2d 269 (2020).

[14] See *TransCanada Keystone Pipeline v. Tanderup*, 305 Neb. 493, 941 N.W.2d 145 (2020).

[15] See *id.*

[16] *Estate of Block v. Estate of Becker*, 313 Neb. 818, 986 N.W.2d 726 (2023).

[14] An appellate court may, at its discretion, discuss issues unnecessary to the disposition of an appeal where those issues are likely to recur during further proceedings.[17] While it is possible the other issues raised by Brush may recur, it is not necessarily likely that they will. Recurrence may depend upon the ultimate resolution of the factual issue regarding the existence or nonexistence of a "floor" on minimum rent. Nothing in this opinion should be read to foreshadow the outcome of that inquiry.

And if those other issues recur, it may be upon a more extensive record and in a different procedural posture. We exercise our discretion and decline to resolve issues unnecessary to the disposition of the appeal.

## VI. CONCLUSION

Because the lease is ambiguous regarding minimum rent, the district court erred in entering partial summary judgment. We reverse, and remand for further proceedings.

Reversed and remanded for
further proceedings.

Miller-Lerman, J., not participating.

---

[17] *In re Estate of Lakin*, 310 Neb. 271, 965 N.W.2d 365 (2021), *modified on denial of rehearing* 310 Neb. 389, 966 N.W.2d 268.